Slip Op. 13-73

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                       :
ROCHE VITAMINS, INC.,                  :
                                       :
            Plaintiff,                 :
                                       :         Before: Richard K. Eaton, Judge
            v.                         :
                                       :         Court No. 04-00175
UNITED STATES OF AMERICA,              :
                                       :         PUBLIC VERSION
            Defendant.                 :
_____ :


OPINION

[Determining the classification of a beta-carotene product.]

Dated: June 14, 2013

*Erik D. Smithweiss*, *Robert B. Silverman*, and *Joseph M. Spraragen*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, for plaintiff.

*Saul Davis*, Civil Division, Department of Justice; *Stuart F. Delery*, Acting Assistant Attorney General, and *Barbara S. Williams*, Attorney in Charge; International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant.


Eaton, Judge:  Before the court is Roche Vitamins, Inc.'s ("plaintiff " or "Roche")

challenge to the classification by United States Customs and Border Protection ("Customs") of

Roche's product "BetaTab 20%" ("the merchandise" or "BetaTab").  The court exercises

jurisdiction pursuant to 28 U.S.C. § 1581(a) (2000).  The case was tried on July 17 through 19,

2012 and post-trial briefing was completed on November 28, 2012.  Based on the findings of fact

and conclusions of law set forth below, the court enters judgment for plaintiff, pursuant to

USCIT R. 52(a) and 58.

## BACKGROUND

Plaintiff challenges Customs' classification of the merchandise, entered on December 16,

2002, under the 2002 Harmonized Tariff Schedule of the United States ("HTSUS") subheading

2106.90.97 as "[f]ood preparations not elsewhere specified or included: [o]ther: [o]ther."  Joint

Proposed Pretrial Order, Sched. C ¶ 4 (ECF Dkt. No. 93) ("PTO").  Plaintiff, the importer of

record, timely filed a protest to the liquidation of the merchandise and, after paying all assessed

duties and fees, commenced this action when its protest was denied.  PTO ¶¶ 1, 5–6.  Plaintiff

argues that the "merchandise is properly classifiable as a synthetic organic coloring matter and/or

preparations based thereon.  [B]eta-carotene, under [HTSUS] subheading [3204.19.35]."  Pl.'s

Compl. ¶ 13 (ECF Dkt. No. 4).  In the alternative, Roche also claims that the merchandise is

classifiable under subheading K3204.19.35 of the Pharmaceutical Appendix and under HTSUS

subheadings 2936.10.00 and 2936.90.00 as "provitamins."[1]  Pl.'s Compl. ¶¶ 16, 19.

On December 23, 2010, this Court denied Roche's motion for summary judgment.  *Roche*

*Vitamins, Inc. v. United States*, 34 CIT ___, ___, 750 F. Supp. 2d 1367 (2010) (Wallach, J.)

("*Roche I*").  There, the Court held that genuine issues of fact as to the principal use of the

merchandise and the functionality of the merchandise's ingredients other than beta-carotene

precluded summary judgment.  *Id*. at ___, 750 F. Supp. 2d at 1378, 1382.

During the course of the trial, the court heard testimony from three witnesses called by

the plaintiff and one witness called by the United States.  Plaintiff's witnesses were Dr. Jean-

---

[1]        Plaintiff's complaint also challenged the classification of its product B-carotene 7% CWS.  Pl.'s Compl. ¶ 11.  On November 13, 2009, the parties entered a stipulation that B-carotene 7% CWS is classifiable under HTSUS 3204.19.35.  Stipulation  ¶ 3 (ECF Dkt. No. 48).  Thus, the classification of that product is no longer in dispute.

Claude Tritsch, Roche's technical director at the time of importation, Dr. Steven Schwartz, an

expert on the bioavailability of carotenoids, and Lynda Doyle, a former employee of Roche's

marketing department with knowledge of Roche's marketing strategy for the merchandise.  The

Government's sole witness was Dr. Robert Russell, a physician specializing in gastroenterology.

Following trial, the parties submitted proposed findings of fact and conclusions of law.


## LEGAL FRAMEWORK

**I.     Standard of Review**

        The court makes its conclusions of law and findings of fact following a trial de novo.  *See*

28 U.S.C. § 2640(a)(1) (2006) ("The Court of International Trade shall make its determinations

upon the basis of the record made before [it].");  *see also United States v. Mead Corp.,* 533 U.S.

218, 233 n.16 (2001) ("The [Court of International Trade] 'may consider any new ground' even

if not raised below . . . and 'shall make its determinations upon the basis of the record made

before the court,' rather than that developed by Customs." (citations omitted)).

        When reviewing Customs' classification decisions, the court applies the HTSUS General

Rules of Interpretation ("GRIs") and the HTSUS Additional U.S. Rules of Interpretation

("ARIs") in numerical order.[2]  *CamelBak Prods., LLC v. United States*, 649 F.3d 1361, 1364

(Fed. Cir. 2011).  GRI 1 mandates that tariff classification initially "be determined according to

the terms of the headings and any relative section or chapter notes."  "'[A] court first construes

the language of the heading, and any section or chapter notes in question, to determine whether

---

        [2]        The GRIs and ARIs are part of the HTSUS statute which "consists of '(A) the
General Notes; (B) the General Rules of Interpretation; (C) the Additional U.S. Rules of
Interpretation; (D) sections I to XXII, inclusive (encompassing chapters 1 to 99, and including all
section and chapter notes, article provisions, and tariff and other treatment accorded thereto); and
(E) the Chemical Appendix."  *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333,
1337 (Fed. Cir. 1999) (citing 19 U.S.C. § 3004(a) (1994)).

the product at issue is classifiable under the heading.'. . . [T]ariff headings are construed without

reference to their subheadings [which cannot] either limit or broaden the scope of a heading."

*Dependable Packaging Solutions, Inc. v. United States*, 37 CIT ___, ___,  Slip. Op. 13-23, at 7

(2013) (quoting *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1440 (Fed. Cir. 1998)).

"Absent contrary legislative intent, HTSUS terms are to be construed according to their common

and commercial meanings, which are presumed to be the same."  *Carl Zeiss, Inc. v. United*

*States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing *Simod Am. Corp. v. United States*, 872 F.2d

1572, 1576 (Fed. Cir. 1989)).  The court "is required to decide the correctness not only of the

importer's proposed classification but of the government's classification as well."  *See Jarvis*

*Clark Co. v. United States*, 733 F.2d 873, 874 (Fed. Cir. 1984).

Customs' factual determinations are entitled to a presumption of correctness.  *See* 28

U.S.C. § 2639(a)(1).  "The presumption is a procedural device that allocates the burden of

producing evidence . . . , placing the burden on [the plaintiff] to show that there was insufficient

evidence for the factual components of [Customs'] decision."  *Chrysler Corp. v. United States*,

592 F.3d 1330, 1337 (Fed. Cir. 2010) (citations omitted).

## II.    The Competing Headings

Here, Customs classified the BetaTab under HTSUS heading 2106: "Food preparations

not elsewhere specified or included."  This provision "is an expansive basket heading that only

applies in the absence of another applicable heading."  *R.T. Foods, Inc. v. United States*, 36 CIT

___, ___, 887 Fed. Supp. 2d 1351, 1358 (2012).  "To *prima facie* fall under [this] heading . . .

two criteria must be met: the product[] must be (1) a food preparation, which is (2) not elsewhere

specified or included."  *Id.*  Thus, to overcome the presumption of correctness, Roche must

demonstrate either that the evidence does not support classification of the merchandise as a "food

preparation," or that the evidence supports classification of the merchandise under a different

heading.  *See Orlando Food*, 140 F.3d at 1441 ("Inherent in the term 'preparation' is the notion

that the object involved is destined for a specific use."); *see also Aromont USA, Inc. v. United*

*States*, 671 F.3d 1310, 1316 (Fed. Cir. 2012); *Arbor Foods, Inc. v. United States*, 30 CIT 670,

677 (2006).

Plaintiff claims the BetaTab is alternatively classifiable as a "coloring matter" under

HTSUS heading 3204 (and K3204 by the inclusion of beta-carotene in the Pharmaceutical

Appendix) or as a provitamin[3] under HTSUS heading 2936.  In *Roche I*, this Court interpreted

heading 3204's term "coloring matter" to be a principal use provision.  *Roche I*, 34 CIT at ___,

750 F. Supp. 2d at 1375–1377.  Because note 2(f) to Chapter 29 (the chapter pertaining to

provitamins) excludes "synthetic organic coloring matter" from that chapter, whether

classification under heading 2936 is appropriate here also hinges, in part, on whether or not the

merchandise is principally used as a "coloring matter."  *Id.* at ___, 750 F. Supp. 2d at 1375

("Note 2(f) . . . cross-references the term 'coloring matter.'").  In other words, if the class or kind

of goods commercially fungible with the merchandise is principally used as a "coloring matter,"

the merchandise will be classifiable under heading 3204 and excluded from 2936 by application

of Chapter 29 note 2(f).

Principal use provisions "'call for a [factual] determination as to the group of goods that

are commercially fungible with the imported goods'" so as to identify "the 'use which exceeds

any other *single* use.'"  *Aromont*, 671 F.3d at 1312 (quoting *Primal Lite, Inc. v. United States*,

---

[3]        Generally, a provitamin is "[a] substance which is converted into a vitamin within
an organism."  OXFORD ENGLISH DICTIONARY 721 (2d ed. 1989); AMERICAN HERITAGE
DICTIONARY OF THE ENGLISH LANGUAGE 1412 (4th ed. 2000) ("A vitamin precursor that the
body converts to its active form through normal metabolic processes.  Carotene, for example, is a
provitamin of vitamin A.").

182 F.3d 1362, 1365 (Fed. Cir. 1999); *Lenox Collections v. United States*, 20 CIT 194, 196

(1996)).  This Court customarily uses several factors, commonly referred to as the

"*Carborundum* Factors," to inform its determination as to which goods are "commercially

fungible with the imported goods."  *Id*. (quoting *Primal Lite*, 182 F.3d at 1365) (internal

quotation marks omitted).

> These factors include: use in the same manner as merchandise which defines the
> class; the general physical characteristics of the merchandise; the economic
> practicality of so using the import; the expectation of the ultimate purchasers; the
> channels of trade in which the merchandise moves; the environment of the sale,
> such as accompanying accessories and the manner in which the merchandise is
> advertised and displayed; and the recognition in the trade of this use.

*Id.* at 1313 (citing *United States v. Carborundum Co.,* 536 F.2d 373, 377 (Fed. Cir. 1976)).  The

actual use of the goods "is evidence of the principal use" but is still only "one of a number of

factors."  *Id.*

        Even if the merchandise is not principally used as a colorant, it is not necessarily

classifiable as a provitamin under HTSUS heading 2936.  Here, for instance, the BetaTab is not

the provitamin beta-carotene in its pure form.  Additional stabilizers were added to beta-carotene

crystalline during the BetaTab's manufacturing process.  Chapter 29 note 1(f) only permits the

addition of a stabilizer to provitamins where "necessary for their preservation or transport."  *See

also* Explanatory Notes to the Harmonized Commodity Description and Coding System, 29.36$_2$

(3d ed. 2002) ("Explanatory Notes") ("The products of this heading may be stabilised for the

purposes of preservation or transport . . . **provided** that the quantity [of stabilizer] added or the

processing in no case exceeds that necessary for their preservation or transport and that the

addition or processing does not alter the character of the basic product and render it particularly

suitable for specific use rather than for general use.").[4]  In other words, if the quantity of a

stabilizing agent added to an item of this heading is more than is necessary for transport or

preservation,[5] or the nature of the stabilizing agent alters the character of the basic product so as

to render it "particularly suitable for specific use," the item may not be classified as a provitamin

under HTSUS heading 2936.  *See Roche I*, 34 CIT at ___, 750 F. Supp. 2d at 1380.

Merchandise that might otherwise be classified under the headings of Chapter 29

becomes "particularly suitable for specific use," and is thus excluded from those headings, when

(1) the ingredients added to it facilitate uses not ordinary to goods of the heading or (2) where the

added ingredients alter the chemical's reactive properties in a manner that excludes uses ordinary

to goods of the heading.  *See, e.g.*, *Degussa Corp. v. United States*, 508 F.3d 1044, 1046 (Fed.

Cir. 2007) (finding particularly suitable for a specific use a chemical with modified reactive

properties that promoted its incorporation into "certain organic solvents and polymers").  Thus, a

product's increased suitability for an *ordinary* application of its chemical component will not

exclude it from Chapter 29, so long as the product can still be used as that chemical in other

ordinary ways.  Added ingredients that make a chemical[6] highly capable of a use that is *not an*

*ordinary use of* chemicals of the heading, however, will render the item "particularly suitable for

---

[4]        The Explanatory Notes, "while not legally binding, are 'persuasive' and are 'generally indicative' of the proper interpretation of [a] tariff provision."  *See Lemans Corp. v. United States*, 660 F.3d 1311, 1316 (Fed. Cir. 2011) (quoting *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008)).

[5]        The court held at summary judgment that "the stabilizing ingredients  . . . are not in quantities greater than necessary to achieve stabilization and do not alter the molecule of beta-carotene" and the parties did not dispute this point at trial.  *Roche I*, 34 CIT at ___, 750 F. Supp. 2d at 1381 n.11.

[6]        Beta-carotene is an organic chemical.  *See* Tr. 124.

specific use rather than for general use" and exclude it from classification in the headings of

Chapter 29.

## III.     The Pharmaceutical Appendix

Certain imports are entitled to duty free status by virtue of their inclusion in the

Pharmaceutical Appendix.  An import is entitled to such status if, when imported from an

eligible country and claimed by the importer, "the individual product [is] listed in the

Pharmaceutical Appendix," its tariff classification contains "the symbol 'K' [in the] special rates

of duty subcolumn for those 8-digit subheadings which contain active ingredients and chemical

intermediaries," and it is "used in the prevention, diagnosis, alleviation, treatment, or cure of

disease in humans." *Advice Concerning the Addition of Certain Pharmaceutical Products and

Chemical Intermediates to the Pharmaceutical Appendix to the Harmonized Tariff Schedule of

the United States,* USITC Pub. 3167, at 7, 3 (Apr. 1999) ("*Advice re: Pharm. App'x*"); *BASF

Corp. v. United States*, 29 CIT 681, 693–94 n.7, 391 F. Supp. 2d. 1246, 1256 n.7 (2005) ("*BASF

I*") ("[The import must be] 'used in the prevention, diagnosis, alleviation, treatment, or cure of

disease in humans or animals,' which the [International Trade Commission] identifies as a

pharmaceutical or 'drug.'" (quoting *Advice re: Pharm. App'x* at 3)), *aff'd*, 482 F.3d 1324 (Fed.

Cir. 2007) ("*BASF II*"); *see also* HTSUS General Note 13 ("Whenever a rate of duty of 'Free'

followed by the symbol 'K' in parentheses appears in the 'Special' subcolumn for a heading or

subheading, any product (by whatever name known) classifiable in such provision which is the

product of a country eligible for tariff treatment under column 1 shall be entered free of duty,

provided that such product is included in the pharmaceutical appendix to the tariff schedule.").

In other words, to enter duty-free, the good must be listed in the Pharmaceutical Appendix,

classified in an appropriate subheading, and intended ultimately to be used as or in a

pharmaceutical product.

In determining whether the import is used as or in a pharmaceutical product, the "principal use" of the goods for classification purposes is not determinative.  As noted, a "principal use" determination for classification purposes calls for the identification of the use "which exceeds any other *single* use," turning not on the actual use of the product, but on the use of the class or kind of goods "commercially fungible" with the product.  *Aromont*, 671 F.3d at 1312.  Duty-free status under the Pharmaceutical Appendix, however, turns on whether consumers of the product itself intend to use it in a pharmaceutical manner.  *See BASF II*, 482 F.3d at 1326 (denying a beta-carotene product duty-free status because it was not "disputed that [the] product is not intended for vitamin or other pharmaceutical use, but is intended for use as a food colorant").

The structure of the HTSUS makes this distinction clear.  There are numerous headings and subheadings that call for a non-pharmaceutical principal use, but which, nevertheless, also contain the symbol "K" in their special rates of duty subcolumn.  *See, e.g.*, HTSUS 3203.00.80; 3204.13.60; 3204.13.80; 3204.90.00.  Inclusion of the symbol, therefore, indicates that Congress intended that some imports with a non-pharmaceutical "principal use" are entitled to duty free status under the Pharmaceutical Appendix nonetheless.  Were that not the case, the inclusion of the symbol "K" in these subheadings would be a dead letter in every such instance.  Moreover, such an interpretation would run afoul of "one of the most basic interpretive canons, that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative, superfluous, void or insignificant.'"  *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation omitted).

# FINDINGS OF FACT

As an initial matter, the court finds that, having had the opportunity to observe their demeanor during direct and cross-examination, all four witnesses testified credibly at trial.

## I.      Principal Use of the Merchandise

The stipulated facts and evidence adduced at trial, when analyzed under the rubric of the *Carborundum* factors, establish that the principal use of the merchandise is as a source of provitamin A in foods or vitamin products, rather than as a coloring matter.

First, the merchandise is actually used in the same manner as other vitamin and provitamin formulations intended for use in the domestic manufacture of vitamin supplements and fortified foods.  Beta-carotene products are used to provide provitamin A activity in the manufacture of direct compression tablets, gel capsules, and nutrient powders.  Put another way, these products are used, regardless of coloring ability, in the manufacture of the types of goods sold as vitamin supplements at drugstores and retailers like GNC or Vitamin Shoppe.  Tr. 623–24.  The products are also used in fortified food products, such as food bars and cereals, for coloration and provitamin activity, or for provitamin activity alone.  Tr. 606–09, 612–13.  BetaTab was developed for use in vitamin products and its actual use during the relevant time period was predominantly as a source of provitamin A for vitamin products.  PTO ¶ 31; Tr. 615.  The "vast majority of" the merchandise has been used for vitamin products.  PTO ¶ 30.

Next, the general physical characteristics of the merchandise lend themselves to a principal use as a vitamin supplement.  The merchandise "is a mixture containing beta-carotene, antioxidants, gelatin, sucrose and corn starch."  PTO ¶ 20.  Beta-carotene crystalline, which makes up twenty percent of the mixture, is an organic colorant with provitamin A activity.  PTO

¶ 8, 10, 22.  The merchandise can be used as a source of vitamin A in foods, beverages, and vitamin products, or as a colorant.  PTO ¶ 23, 29.  Further, it is a water miscible version of provitamin A.  Tr. 726.  The merchandise, however, has a higher concentration of beta-carotene than other products used primarily for coloring and, unlike some of those products, is only dispersible in water above twenty degrees Celsius.  PTO ¶ 27, 37.  The high concentration and high bioavailability of beta-carotene in the merchandise makes it preferable for use in dietary supplement tablets.  Tr. 704–07.  In most cases, a higher potency beta-carotene product is preferred for the manufacture of tablets in the dietary supplement industry.  Tr. 155–56.  Moreover, the merchandise was developed by Roche specifically "for use in high potency and anti-oxidative vitamin tablets."  Tr. 291.

Use of the BetaTab as an ingredient to provide provitamin A activity, rather than as a colorant, is commercially practical.  The majority of the merchandise sold by Roche in 2002 was sold for nutritional use.  Tr. 615; Pl.'s Ex. 42.  Other beta-carotene products that do not provide coloration, such as Roche's B-Carotene 10% B, are sold for nutritional use to large food producers.  Tr. 612–13; Pl.'s Ex. 42.  BASF, a significant competitor of Roche, also sold beta-carotene products primarily for use in the manufacture of tablets and capsules.  Tr. 616–19.  The BetaTab is marketed for use as a vitamin A source in vitamin products and "the vast majority of" the merchandise has been used for vitamin products.  PTO ¶ 28, 30.  The merchandise can, however, also be used in an economically practical manner as a colorant.  Tr. 573–576.  As such, this factor is not very probative.

The ultimate purchasers of the BetaTab do not draw a bright-line distinction between its use as colorant and its use as a vitamin.  Roche's customers understand that beta-carotene products have a dual function as both a colorant and a source of provitamin A activity.  Tr. 577.

Accordingly, purchasers expect the merchandise to provide both nutrition and coloration

simultaneously.  Tr. 577.  Thus, this factor is also not particularly probative.

   The channels of trade in which the merchandise moves and the recognition of the use in

the trade indicate a principal use as a provitamin product.  The beta-carotene used in the

manufacture of the merchandise is produced domestically by Roche, sent abroad for processing,

and then imported as a mixture with the additional components.  PTO ¶ 40.  Manufacturers of

vitamin tablets are considered to be part of the dietary supplement industry and not part of the

food industry.  Tr. 621–22.  There is a recognized market for direct compression tablets and

capsules.  *See* Tr. 640.  The merchandise was targeted for sale in that market by the Roche sales

employees and "recommended strictly for nutrition."  Tr. 640–41.   Roche's research and

development reports list only other beta-carotene products that are not used as colorants as

products competitive with the merchandise.  Tr. 302–03; Def.'s Ex. H6 at 6.  Roche's annual

sales report for 2002 identifies the merchandise, and no other merchandise, as sold through

Roche's "Human Nutrition Health" division.  Tr. 252; Def.'s Ex. G.

   The environment of sale and advertising strongly indicate that the BetaTab is principally

used as a source of provitamin A.  The merchandise "was not produced or marketed for sale as a

colorant during the relevant time period" and Roche's marketing materials make no mention of

the merchandise's "use as a food colorant."  PTO ¶ 31, 34.  Those materials also lack any

indication of the color intensity the merchandise would be expected to produce if used as a

colorant.  PTO ¶ 34.  The merchandise is marketed as "tablet grade" so as to direct sales of the

product by Roche employees to the "dietary supplement industry."  Tr. 535.  The term "tablet

grade" indicates that the merchandise can be used in the manufacture of direct compression

tablets.  Tr. 262–63, 535.  Even though Roche's sales employees would work directly with

customers in order to determine which of Roche's various beta-carotene products would best suit

their needs, and those employees did not necessarily rely on color charts and stability testing to

recommend products, Roche personnel tended to sell the merchandise to customers that intended

to use it in direct compression tablets and capsules.  Tr. 539, 597–98.


## II.       The Merchandise is Not Particularly Suited for a Specific Use

The additional ingredients added to the mixture do not make the BetaTab particularly

suited for specific use outside of the ordinary uses of beta-carotene.  First, a stabilizing matrix of

some kind is necessary for any beta-carotene product.  In its pure crystalline form, beta-carotene

is unstable and susceptible to oxidation, which destroys its healthful properties and usefulness as

a colorant.  PTO ¶ 11, 14–15.  Beta-carotene must be processed and combined with other

ingredients to be commercially usable as either a provitamin or a colorant.  PTO ¶ 11.

Roche's manufacturing process does not change the BetaTab's functionality as a

provitamin.  The manufacturing process Roche uses to create the merchandise does not change

the character of the beta-carotene as provitamin A.  Tr. 726.  The process used to create the

BetaTab, that is, the technology by which Roche adds additional ingredients that envelop the

beta-carotene crystalline in a matrix, is common throughout the industry for several different

types of vitamin.  Tr. 42.  That same technology is used to produce all Roche beta-carotene

forms.  Tr. 43.  There is no evidence that the merchandise's non-beta-carotene ingredients

enhance absorption or bioavailability of the beta-carotene in a manner greater than any other

stabilizing matrix.  Tr. 331–35, 357, 379, 389, 393, 472–73, 715–17.  Moreover, an increase in

the bioavailability of a provitamin product does not change its use as a provitamin.  Provitamins

for human consumption are intended to be ingested and processed by the body to yield vitamin

activity.  The increased bioavailability of a particular provitamin merely improves that ordinary

use of goods within the class of provitamins.

     That the additional ingredients make the BetaTab highly suitable for tableting does not

make the merchandise particularly suitable for a specific use.  Although highly suitable for

tableting, the merchandise contains no ingredients specifically prepared for tableting.  Tr. 164–

66.  That suitability is not at odds with use as a provitamin or with the product's other uses.  The

additional ingredients, or matrices, of the various Roche products are "basically the same" for

lower potency products suitable for human consumption that are used for coloration purposes as

for higher potency products that are used for vitamin and nutritional products.  Tr. 350, 349–57.

Other Roche products, primarily used as colorants, also have characteristics that make them

highly suitable for tableting.  Tr. 403.  Some of those products are used to make tablets for

nutritional use.  Tr. 425–28.  The merchandise is well suited for fortifying foods with provitamin

A.  Tr. 446–47.  Other, less potent, Roche beta-carotene products are also well suited for

fortifying foods.  Tr. 448–449.

     Finally, the tableting process is a step that transforms the merchandise, which is

essentially a bulk beta-carotene ingredient, into a final product for sale.  The merchandise's

increased suitability to be used in the creation of tablets for retail sale is a particular kind of use

within the uses common to members of the provitamin category.


**III.     The Merchandise is Used as an Ingredient in Products Designed to Promote Health**

     The merchandise is primarily used to create vitamin supplements and fortified foods.  As

noted, "the vast majority of" the merchandise has been used for vitamin products and the

merchandise is principally used in that manner.  PTO ¶ 30.  The product was sold through

Roche's "Human Nutrition Health" division.  Tr. 252; Def.'s Ex. G.  Dietary supplements are

intended to provide customers with nutrients that they are not otherwise ingesting in sufficient

amounts for optimal health.  Tr. 374–75.  Like most supplements, the merchandise is a

"formulation that is meant to maintain general health or well-being."  Tr. 478.  Although the

product would not normally be used in the medical treatment of vitamin A deficiency, it is used

with the purpose of maintaining healthy levels of vitamin A.  Tr. 730.  In addition to helping

those who consume it to avoid vitamin A deficiency, research suggests that provitamin A may

have a prophylactic effect against certain cancers.  Tr. 731–32.  Thus, the BetaTab is used in a

manner designed to promote human health.


## CONCLUSIONS OF LAW

### I.      The Merchandise is Properly Classified under HTSUS Heading 2936

As determined at trial, the merchandise is principally used a source of provitamin A in

foods or vitamin products, rather than as a "coloring matter."  Consequently, the BetaTab cannot

be classified under Heading 3204.  As noted, in order to be classified under HTSUS heading

3204, an imported good must be principally used as a "coloring matter."  *Roche I*, 34 CIT at ___,

750 F. Supp. 2d at 1375–78.  Thus, the merchandise cannot be classified under Heading 3204.

Because the merchandise cannot be classified under subheading 3204.19.35, the court does not

reach whether the BetaTab would qualify for duty-free entry under that subheading as a result of

its inclusion in the Pharmaceutical Appendix.

The merchandise is a "provitamin" covered by Heading 2936.[7]   There is no dispute that beta-carotene is provitamin A.  It was demonstrated as a matter of fact at trial that the BetaTab's additional non-beta-carotene ingredients, added as stabilizers, do not make the merchandise particularly suitable for specific use.[8]   Consequently, the addition of the stabilizing ingredients is permissible under note 1(f) to Chapter 29, and does not exclude the merchandise from classification under Heading 2936.  As a result, the merchandise is included in the class of goods covered by Heading 2936 and its subheadings.

Because the merchandise is classifiable under another heading, Roche has overcome the presumption of correctness to which Customs' classification was entitled.  As noted, to fall under Customs' selected heading, Heading 2106, an imported good must be both (1) a food preparation, and (2) not elsewhere specified or included.  The trial evidence demonstrated that the merchandise is a provitamin and is not particularly suited to specific use, rendering it classifiable within Heading 2936.  As such, the merchandise is "elsewhere included."  Therefore, Roche has demonstrated that BetaTab fails the second requirement for classification in Heading 2106 and that Customs' decision to classify the BetaTab in that heading is incorrect.

---

[7]       Heading 2936 covers: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent."

[8]       Although it did not have the burden of proof, the defendant attempted to demonstrate at trial that the stabilizing ingredients made the pelletized crystals more suitable for absorption by the human intestines than would otherwise be the case.  The defendant's purpose was to demonstrate that the stabilizers made the BetaTab particularly suitable for a particular use.  The defendant, however, did not succeed.  There was no evidence produced at trial that the stabilizing ingredients made the merchandise more absorbable by the intestines than provitamin A would be if stabilized by other ingredients.  Hence, even if increased bioavailability were sufficient to exclude classification under Chapter 29, the facts necessary for that proposition were not established at trial.

## II.     The Merchandise is Properly Classified under HTSUS Subheading 2936.10.00

Under GRI 6, "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes" and by application of the other GRIs.  Within Heading 2936, there are only two potentially applicable subheadings:  2936.10.00[9] and 2936.90.00.[10]  Subheading 2936.10.00 covers "[p]rovitamins, unmixed" and 2936.90 is a basket category covering "[o]ther, including natural concentrates." Thus, because the BetaTab consists of provitamin A with added stabilizing ingredients, selection of the appropriate subheading turns on the construction of the term "unmixed."[11]

The terminology of Heading 2936 makes clear that Congress intended the term "unmixed" in subheading 2936.10.00 to indicate that the subheading does not encompass mixtures of different kinds of vitamins or provitamins, but does encompass mixtures of vitamins or provitamins with the stabilizing ingredients permitted by note 1(f) to Chapter 29.  In other words, a vitamin or provitamin that is mixed with other ingredients that are not "[p]rovitamins [or] vitamins"  remains "unmixed" for purposes of classification in subheading 2936.10.00. Thus, the 2936.10.00 term "unmixed" means "unmixed with other vitamins or pro-vitamins."

The heading language, common to both 2936.10.00 and 2936.90.00 confirms this conclusion.  That language, "intermixtures of the foregoing, whether or not in any solvent,"

---

[9]      HTSUS 2936.10.00 reads in full: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: Provitamins, unmixed."

[10]      HTSUS 2936.90.00 reads in full: "Provitamins and vitamins, natural or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as vitamins, and intermixtures of the foregoing, whether or not in any solvent: Other, including natural concentrates."

[11]      It is worth noting that all of the subheadings of heading 2936 carry a duty rate of "Free."

makes clear the congressional intention that goods of the heading are to be treated differently

from other ingredients for purposes of what is a "mixture."  The phrase "of the foregoing" limits

the ordinarily broad term "intermixture" to combinations of "[p]rovitamins and vitamins, natural

or reproduced by synthesis (including natural concentrates), derivatives thereof used primarily as

vitamins."  The phrase "whether or not in any solvent" further indicates that Congress did not

intend the terms "mixture" and "intermixtures" to include the combination a provitamin of the

heading and substances outside the heading.  Otherwise, the express inclusion of solvents would

be surplusage, as any solvent-provitamin combination would be an "intermixture."  *Marx v. Gen.*

*Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013) ("[T]he canon against surplusage is strongest when

an interpretation would render superfluous another part of the same statutory scheme.").

That this narrower understanding of the term "mixture" carries down to the subheading

level is shown by the structure of the subheadings.  All of 2936's subheadings refer to a plural

noun or conjunction followed by: ", unmixed" with the exception of 2936.90.00, the catch-all.

*Compare* HTSUS 2936.90.00 ("Other, including natural concentrates"), *with* HTSUS 2936.10.00

("Provitamins"), HTSUS 2936.21.00 ("Vitamin A"), 2936.22.00 ("Vitamin $B_1$"), 2936.23.00

("Vitamin $B_2$"), 2936.24.00 ("Vitamin $B_3$ or Vitamin $B_5$"), 2936.25.00 ("Vitamin $B_6$"),

2936.26.00 ("Vitamin $B_{12}$"), 2936.27.00 ("Vitamin C"), 2936.28.00 ("Vitamin E"), *and*

2936.29.00 ("Other vitamins and their derivatives").  Thus, if the term "unmixed" were

construed to include mixtures of the named vitamins and provitamins of the heading with *any*

other substance, then the addition of any of the water, stabilizers, solvents, antidusting agents,

colorings, and odoriferous substances expressly permitted by notes 1(d) through (g) to Chapter

29, would prohibit classification of those substances under their eo nomine[12] subheadings.  That is, under that interpretation, any vitamin or provitamin requiring the addition of those substances for transport, safety, or stabilization would automatically be pushed into the basket subheading.  Such a reading makes little sense.  Thus, the subheadings and the Chapter notes, read together, indicate that the term "unmixed" contained in the subheadings of Heading 2936 is intended to mean "unmixed with the other vitamins and provitamins of this heading."

Accordingly, the additional stabilizing ingredients added to the beta-carotene crystalline to create the BetaTab do not render the product a mixture for purposes of subheading 2936.10.00.  Therefore, because BetaTab is a provitamin compound, subheading 2936.10.00 is the correct subheading and the merchandise is properly classified thereunder.


## CONCLUSION

For the reasons stated above, the court concludes that the correct tariff classification for the BetaTab 20% is HTSUS subheading 2936.10.00 and the merchandise is subject to a duty rate of "Free." Judgment will enter accordingly.


                                                        _____/s_____
                                                               Richard K. Eaton


Dated: June 14, 2013
        New York, New York

---

[12]        "An *eo nomine* provision is one 'in which an item is identified by name.'"  *Arko Foods Int'l, Inc. v. United States*, 33 CIT __, __, 679 F. Supp. 2d 1369, 1375 n.24 (2009) (quoting *Len–Ron Mfg. Co. v. United States,* 334 F.3d 1304, 1308 (Fed. Cir. 2003)).